UNITED STATES of America, et al., Petitioners,

v.

LEASEWAY TRANSPORTATION CORP., et al., Respondents.

No. C80–1116.

United States District Court, N. D. Ohio, E. D.

Oct. 15, 1981.

Mitchell Ehrenberg, Asst. U. S. Atty., Cleveland, Ohio, for petitioners.

Stewart I. Mandel, McCarthy, Lebit, Crystal, Kleinman & Gibbons Co., L. P. A., Cleveland, Ohio, for respondents.

**1334**

BEN C. GREEN, Senior District Judge:

The Internal Revenue Service (IRS) brings this action pursuant to 26 U.S.C. § 7604 to enforce its summons for production of internal audit reports of the Leaseway Transportation Corp. (Leaseway).

A hearing on the petition was held June 10 and 11, 1981. After considering the testimony, the arguments and briefs of counsel, the Court makes the following findings of fact and conclusions of law.

Leaseway is a Cleveland-based corporation engaged in the contract leasing of trucking equipment and warehousing. It conducts business on a nationwide basis through 189 subsidiaries.

In July, 1979, the IRS began its audit of the consolidated tax returns of Leaseway and its subsidiaries for tax years 1975 through 1977. At Leaseway's request, the tax year 1978 was added to the audit period.

Because of Leaseway's size and scope of operations, the IRS classified the audit as a "large case" and applied established management techniques and standards for "regionally controlled" large cases to the audit.

IRS Agent James Simeo was designated "case manager" for the audit. As such, he had overall responsibility for managing the audit. Agent Kenneth J. Robins was appointed "team audit coordinator" of the IRS staff while on site at the Leaseway headquarters. Robins was familiar with Leaseway's operations and structure, as he had coordinated the audit of Leaseway's returns for the tax years 1973 and 1974.

At the commencement of the audit, Simeo made the decision that any internal audit reports which had been prepared by Leaseway would be examined as part of the audit. This decision was not wholly discretionary on Simeo's part. The IRS "Controlled Examination Program" casebook for case managers strongly suggests, if not requires, that internal audit reports (IARs) be examined as part of any audit. Further, Simeo had read the post-audit critique prepared by the case manager of the previous Leaseway audit; the critique plainly recommended that future audits of the corporation include examination of the company's internal audit reports.

In mid-October, 1979, Simeo visited the Leaseway headquarters where the audit team had been working. While there, he directed Robins to examine Leaseway's IARs. On October 17, Robins issued an Information Document Request (IDR), the 21st in a series of many such requests. IDR 21 asked for a list of all internal audit reports prepared by the corporation or any of its subsidiaries during the audit years in question.

In an undated, unsigned reply to IDR 21, the company responded to the request by saying:

> We believe the internal audit reports requested are not necessary to the accurate determination of Leaseway's consolidated federal income tax liability since they are primarily reports which recommend to management ways to improve operating efficiencies. Consequently, we respectfully refuse to honor this request.

Although the audit had been under way for some time, on November 21, 1979, a "pre-audit" conference was held between the IRS team and the Leaseway officials involved. Representing Leaseway, among others, was Raymond J. Rehor, the corporation's Vice-President for Taxes, and Alan Kalous, the manager of federal taxes. Simeo advised Rehor and Kalous that IARs would be requested during the audit.

In January, 1980, Simeo again visited the Leaseway site to discuss the progress of the audit with Robins. During the discussion, Simeo discovered that Robins had made no further efforts to obtain the list of IARs which had been initially requested in IDR 21. Simeo instructed Robins to make every effort to secure such a list.

As a result of subsequent discussions with Leaseway management, Robins secured a list of those Leaseway subsidiaries subjected to internal audits during the years in question. The list indicates that 15 subsidiaries were audited in 1975; 35 in 1976; 49 in 1977; and 48 in 1978; or a total of 147

internal audits during the tax years being audited by the IRS.

After receiving the list, Robins and Simeo agreed that instead of requesting production of all 147 IARs, a supplemental IDR would be issued requesting only four. If the four specific reports disclosed nothing of relevance to the audit, the agents agreed, no further IARs would be sought. IDR 163 was issued on January 25, 1980, requesting IARs for four specific subsidiaries audited in 1977 and 1978.

On February 14, Rehor visited Simeo and delivered a letter declining to comply with IDR 163. In the letter and during their conversation, Rehor told Simeo that the IARs concerned operational matters only, and contained no information having an effect on Leaseway's tax liability.

Simeo then asked Rehor to provide the IRS with any written manuals or directives to Leaseway's internal audit staff. IDR 176 was subsequently issued to formalize that request. No response was made to IDR 176.

The Leaseway executives involved in the audit testified that Robins expressed doubts to them regarding the necessity to examine the IARs. The executives testified that Robins was reluctant to issue IDRs regarding the reports and did so only because of pressure from Simeo. Rehor testified that when Robins served him with the summons, Robins apologized, and said he was acting under direct orders from Simeo.

In his testimony, Simeo confirmed that Robins was reluctant to pursue the issue of the IARs, but changed his mind after the summons was served. Robins issued and served the summons on April 8, 1980.

On April 21, Rehor met with Donald Heidler, Chief of the Examination Branch of the IRS Cleveland District Office. Rehor testified that at the meeting he asked Heidler why Leaseway was being singled out, i. e., why other Cleveland-based companies of similar size were not being asked to produce IARs. Rehor testified that Heidler's response was to the effect that Leaseway was a good "test case," and that IARs would not be aggressively sought from other companies.

Rehor also testified that Heidler indicated particular interest in Leaseway's IARs because the company "had turned up relatively clean in the past audits and the government really hasn't gotten much money out of Leaseway in the past."

During his testimony, Heidler was not questioned regarding what was said at the April 21 meeting. But Heidler did testify that he was of the impression that large case audits generally yielded "around" 30 per cent additional revenue as a percentage of taxes originally paid. Heidler also testified that Leaseway was "below average" in the amount recovered after audits. The IRS did not challenge Rehor's testimony that the permanent additional tax dollars paid by Leaseway after audits for years 1971 through 1978 was about six-tenths of one per cent.

In July, 1980, Simeo and his staff met with Rehor and his staff to discuss the status of the audit. It was agreed that the audit was nearly completed and that only three issues remained. The first was the matter of the IARs. The second was a question of salvage value of specific equipment. The third was a question of whether certain taxes were to be paid to the government of Canada or to the United States. Simeo instructed Richard Kaiser, the new team audit coordinator who succeeded Kenneth Robins who had passed away, to begin writing his report. It is not clear from the testimony whether such a report was written, but Simeo testified that by July, 1980, the field work for the audit was completed.

This action to enforce the summons for the IARs followed. The parties engaged in limited discovery prior to the hearing.

Title 26, United States Code, § 7602 reads, in part:

> For the purpose of ascertaining the correctness of any return, . . . the Secretary . . . is authorized—
>
> (1) To examine any books, papers, records, or other data which may be relevant to such inquiry;

(2) To summon ... any officer or employee [of the taxpayer] ... to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, ... as may be relevant or material to such inquiry; ...

Title 26, United States Code, § 7604 reads, in part:

(a) If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, records, or other data.

The parties agree that the foregoing sections are to be considered in light of *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). The parties further agree that, pursuant to *Powell,* the IRS need not show probable cause to enforce the summons, but must satisfy four criteria.

■ First, it must appear that the information sought is for a valid purpose, i. e. not for the purpose of harassment. Second, the IRS must show that the information sought is relevant to that purpose. Third, the government must show that the information is not already within the possession of the IRS. Fourth, it must appear that the administrative steps required by the IRS prior to the issuance of the summons have been followed. While the IRS has the burden of showing the latter three elements, the taxpayer has the burden of proving any improper motive. *United States v. Powell, supra.*

Leaseway does not seriously contest that the IRS has followed the administrative procedures required to issue the summons. While the issue of procedural regularity was raised in the company's pre-hearing brief, Leaseway made no inquiry at the hearing with regard to the issue, and has not discussed the matter in its post-hearing briefs.

Similarly, Leaseway does not seriously contest that the IARs sought are not already within the possession of the IRS. Like the matter of procedure, the issue was raised in pre-hearing briefs, but not mentioned in post-hearing argument.

There was testimony at the hearing to the effect that the IRS may have such information as may be contained in the IARs from other sources. But the testimony was plain that the IRS does not have the specific IARs which were summoned.

Such a determination disposes of the issue. "Courts applying the 'already-in-possession' portion of the *Powell* test have applied a literal interpretation." *First Chicago Corp. v. United States,* 79–1 U.S.T.C. ¶ 9111 (N.D.Ill., 1979). The simple question is whether the actual documents summoned are within the possession of the IRS. *United States v. Arthur Andersen and Co.,* 474 F.Supp. 322, 330 (Mass., 1979). The simple answer is that the IARs are not in the possession of the IRS.

Leaseway's defense to the summons thus rests upon two allegations. First, Leaseway argues, the summons was issued for an improper purpose, i. e., harassment. Second, the company claims the IARs are not relevant to the purposes of the audit.

Leaseway's first argument is based on its allegation that the government is "frustrated." Because the IRS "has never gotten any money out of Leaseway," as a result of its audits, the IRS needs a "moral victory" with respect to the IARs.

In support of this theory, Rehor testified that he attended a seminar for corporate tax executives at which a former IRS commissioner spoke. According to Rehor, the former commissioner indicated that the government's policy was to request IARs, but not to seek them aggressively if the taxpayer declined to deliver them.

Rehor also testified that he contacted tax executives of other large Cleveland-based corporations, and learned from them that the IRS had not requested IARs when auditing the tax returns of those other corporations.

Finally, after pointing to Heidler's comments, Rehor and other Leaseway executives testified that Agent Robins frequently expressed reluctance to seek the IARs, and quoted Robins as saying he did not need the IARs to complete the audit.

Heidler testified, however, that of the four companies mentioned, only two were audited pursuant to the "controlled case" criteria by which Leaseway was audited. Heidler also testified that the IRS requested IARs from both of those companies, and the companies provided the reports. Thus, there is no basis for a claim of harassment based on any disparity of treatment.

█ The Court does not find that the statements of the former IRS Commissioner nor those of Agent Robins provide an indication of harassment. A change in policy by the IRS after a commissioner leaves office is not indicative of harassment of an individual taxpayer. Nor does disagreement between an agent and his superiors give rise to an inference of harassment.

█ Finally, Heidler's comment that Rehor should not worry; that "the government had never gotten any money out of Leaseway," may be interpreted in two ways. One would lead to a finding of frustration and retaliation, as the company claims. The other would be one of reassurance, a statement to Rehor that, as far as Heidler was concerned, Leaseway had and was accurately reporting its tax liability and that production of the IARs would not lead to any financial loss to the company.

The Court finds that even if Heidler's statement was evidence of harassment or improper motive, the statement does not rise to the level of "substantial proof" required to show abuse of the Court's process. *United States v. Powell, supra,* at 379 U.S. 58, 85 S.Ct. at 255; *United States v. Kessler,* 338 F.Supp. 420 (S.D.Ohio, 1972). The claim of harassment or improper purpose has not been proved.

Leaseway's final claim is that the IARs sought are not relevant and material to the determination of the accuracy of its tax returns. It claims that the IRS has not shown that the reports will contain matters related to the company's tax liability, but rather deal only with internal policies and controls of the corporation.

In *United States v. Powell, supra,* at 379 U.S. 57, 85 S.Ct. at 255, the Court said that the extent of the IRS' "inquiry must not be 'limited ... by forecasts of the probable result of the investigation.'" The IRS, the Court said:

... has the power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend upon a case or controversy for power to get evidence but can investigate merely upon suspicion that the law has been violated or even just because it wants assurance that it has not.

In the abstract, such language would provide the IRS with the authority to demand records which in any way deal with a taxpayer's finances. The concrete facts in this case lead to the same result.

As part of its case, Leaseway called Dr. Walter G. Kell, professor of accounting at the University of Michigan. Dr. Kell, a certified public accountant, specializes in the area of audits, and has served on professional committees which have established recognized national audit standards.

Dr. Kell testified that at the request of Leaseway management, he examined the corporation's internal audit operations and the manner in which its tax returns were prepared. He then made a cursory examination of approximately 140 of Leaseway's IARs for the tax audit period, then selected eight IARs for detailed review.

Dr. Kell testified that the IARs were almost entirely operational in character. That is, the reports dealt almost exclusively with internal controls, compliance with policies, and efficiencies of the respective subsidiaries.

Dr. Kell did testify, however, that the reports contained "reference to individual transactions engaged in by the specific subsidiary," and contained "one or two correct-

ing entries relative to an incorrect reversal of an entry or in correct recording of an entry." The latter, Dr. Kell said, "could conceivably have an impact on the financial statement" from which the tax return was prepared.

Dr. Kell also testified that the IARs he examined contained "timing adjustments." That is, adjustments as to the date a particular transaction would be posted by the subsidiary's bookkeepers. It was conceded that a timing adjustment generally had no effect on the permanent tax liability of the corporation; an adjustment might mean that tax would be paid for one year rather than for another. But Dr. Kell testified that the timing of an entry could have an effect on the accuracy of a particular tax return.

Dr. Kell also testified that one IAR he examined suggested that a subsidiary keep more detailed records to substantiate ledger entries. Since the IRS examines substantiating records for ledger entries as part of an audit, whether the company kept sufficient records might tend to shed light on the correctness of the return.

■ The question for this Court to decide is not whether the IARs sought *are* relevant and material to the audit. "[T]his Court is to decide only whether the reports *may* be relevant." *United States v. Riley Co.*, 80–1 U.S.T.C. ¶ 9157 (N.D.Ill., 1980) (emphasis in original).

The Court concludes from the testimony that the IARs summoned by the IRS may, in fact, shed light on the correctness of the Leaseway tax returns. The IARs may show that Leaseway has correctly reported its tax liability. They may show that it has not. They may show nothing of value to the IRS. But the IRS is entitled to examine them.

The Court notes the decisions of other courts which have examined the issue of whether IARs are material to a tax audit, and have reached the same result. *United States v. Noall*, 587 F.2d 123 (C.A. 2, 1978); *United States v. Arthur Andersen and Co., supra; United States v. Riley Co., supra.*

■ The Court concludes that Leaseway has not shown that the summons issued in this case was for an improper purpose. The IRS has shown that proper procedures were followed and that the information sought is not already in its possession. Finally, a showing was made that the information summoned may shed light on the correctness of Leaseway's consolidated tax returns.

An order will be entered granting the petition for enforcement.