[No. S001602. July 31, 1989.]

UNION PACIFIC RAILROAD COMPANY, Plaintiff and
Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

## COUNSEL

Jay R. Martin, Peter W. Davis, John E. Carne, James C. Martin, Paul D. Fogel and Crosby, Heafey, Roach & May for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Timothy G. Laddish and Calvin J. Abe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EAGLESON, J.—The State Board of Equalization (board) seeks to obtain from Union Pacific Railroad Company (Union Pacific) portions of a confidential corporate plan that reveal Union Pacific's strategy for possible future acquisitions. Union Pacific refused to produce the information on the ground that it is not reasonably relevant to a legitimate inquiry by the board regarding assessment of Union Pacific's existing taxable property. The board rejected Union Pacific's explanation and imposed a penalty assessment against it. Union Pacific seeks judicial relief from the board's demand for information and from the penalty assessment.

The board contends the California Constitution, article XIII, section 32 (hereafter article XIII, section 32), prohibits any judicial review of matters relating to a tax assessment until after the assessee has paid the tax and filed an action for a tax refund. We hold that Union Pacific's action is not barred

by article XIII, section 32, because the information as to possible future acquisitions is not reasonably relevant to the board's assessment function. The penalty assessment was therefore improper and can be challenged before it is paid.

## FACTS

Union Pacific operates an interstate railroad system. The board is required to assess annually Union Pacific's taxable property. (Cal. Const., art. XIII, § 19; Rev. & Tax. Code, § 721.) In 1984, the board requested Union Pacific to produce its 1983 Strategic Plan (the plan). It contains among other things: (1) an assessment of major market and commercial opportunities and a discussion of the company's strategic direction; (2) estimates of future asset requirements; (3) forecasts of future capital and financing requirements for potential acquisitions; and (4) a self-evaluation of the strengths and weaknesses of groups within Union Pacific and of its competitors in related industries. Union Pacific analyzes in the plan what assets the company may or may not purchase in future years and projects what income might be produced by the expanded company if Union Pacific acquires those assets.

Union Pacific produced the parts of the plan dealing with currently held property but declined to produce the portions relating to possible future acquisitions of new property and the projected income from those possible acquisitions.[1] Union Pacific contended this information was irrelevant to the board's function of assessing the value of existing property; that this information was highly sensitive and confidential; and that its disclosure would cause irreparable harm to Union Pacific.

The board rejected Union Pacific's explanation and imposed a $5 million penalty assessment pursuant to Revenue and Taxation Code section 830, which resulted in an additional tax liability of approximately $57,500. Union Pacific petitioned the board for abatement of the penalty. The board responded by issuing a subpena demanding immediate production of the entire plan.

Union Pacific petitioned the San Francisco Superior Court for a writ of mandate or prohibition quashing the subpena. The court issued an alterna-

---

[1] Union Pacific's response to the board's request stated, "We have enclosed portions of the 1983 Strategic Plan and will not produce other portions which contain a self-analysis of the strengths and weaknesses of various Union Pacific departments and financial projections on an integrated nonsegrable [sic] basis concerning existing, replacement and other assets which may be acquired . . . ."

tive writ and order to show cause. The board obtained a continuance of the hearing of the matter and agreed to hold in abeyance until after the hearing Union Pacific's petition to the board for abatement of the penalty.

On November 30, 1984, the trial court entered a judgment issuing a peremptory writ of prohibition "permanently restraining and prohibiting the California State Board of Equalization from demanding or requiring the production of the Union Pacific Railroad Company 1983 Strategic Plan." On December 7, the board filed a notice of appeal and a return to the writ. The return stated that the board "plans to take no further action to demand or require the production of the Union Pacific Railroad Company's 1983 Strategic Plan."

On December 11, one day after the date on which unpaid taxes became delinquent, the board denied Union Pacific's pending petition for abatement of the $5 million penalty assessment despite the board's representation four days earlier that it would take no action to require production of the plan. Union Pacific paid approximately one-half of the penalty tax in December 1984 with its first installment payment of the 1984-1985 property taxes.

Contending the board's decision was in violation of the writ of prohibition, Union Pacific applied to the trial court for an order to show cause why the board should not be held in contempt for refusing to abate the penalty assessment. The trial court declined to hold the board in contempt but expressly found that the board knew the court's intent in issuing the writ of prohibition was "to prohibit the imposition of any penalty on UPRR [Union Pacific] for not producing its 1983 Strategic Plan" and that the board had violated this intent by refusing to abate the penalty assessment. The trial court prohibited the board from imposing or enforcing any penalty against Union Pacific and from acting to prevent Union Pacific from reducing its second installment payment for 1984-1985 taxes by the amount of the penalty previously paid. The board appealed from that order.

After further briefing and hearing, the trial court found the board's actions in refusing to abate the penalty "were not based on good faith, were frivolous and caused unnecessary delay" within the meaning of Code of Civil Procedure section 128.5. The trial court awarded Union Pacific $9,950.50 in attorney fees and costs. The board appealed from that order as well.[2]

---

[2] The Court of Appeal consolidated the board's three appeals. The appeal from the judgment granting the writ of prohibition is case number A030006; the appeal from the subsequent order prohibiting imposition or enforcement of the penalty is case number A031647; and the appeal from the order awarding attorney fees is case number A032316.

The Court of Appeal reversed the three orders and remanded to the trial court for a determination of whether the information sought by the board was reasonably relevant to its assessment of Union Pacific's taxable property. Although the board was the prevailing party, it petitioned this court for review of the Court of Appeal's decision, arguing that the California Constitution prohibits any judicial review of matters relating to a tax assessment until after the assessee has paid the tax and filed an action for a tax refund. We granted review and held the matter pending our decision in *Western Oil & Gas Assn.* v. *State Bd. of Equalization* (1987) 44 Cal.3d 208 [242 Cal.Rptr. 334, 745 P.2d 1360] (*Western Oil*), which also involved the propriety of a prepayment judicial challenge to a board request for information.

After we decided *Western Oil,* we transferred this case to the Court of Appeal for reconsideration in light of our decision. In its second opinion, the Court of Appeal concluded it was unable to find that the information as to Union Pacific's possible future activity is not reasonably relevant to the board's assessment of Union Pacific's property. The Court of Appeal reversed the order granting the writ of prohibition and the order awarding attorney fees but affirmed the order prohibiting the imposition of a penalty. We granted review a second time.

DISCUSSION

1. *The Court of Appeal applied the correct standard in reviewing the order granting the writ of prohibition.*

██ The Court of Appeal held that ". . . the superior court cannot enjoin the production of a taxpayer's specific business records unless the taxpayer proves the information in the records is not reasonably relevant to a legitimate inquiry or has no conceivable basis for assessing a tax."[3] The board contends this holding is incorrect under the standard we set forth in *Western Oil, supra,* 44 Cal.3d 208, for obtaining prepayment judicial relief from an attempt by the board to compel disclosure of information by an assessee. More specifically, the board contends it can compel disclosure of irrelevant information without being subject to prepayment judicial review. The board's interpretation of *Western Oil* is untenable.

In *Western Oil,* we rejected a prepayment challenge to a demand by the board for assessees' business records. As in the present case, the board

---

[3] There appears to be an inadvertent grammatical error in the Court of Appeal's holding. As worded, the "no conceivable basis" reference seems to modify "information." If so, the sentence would mean that *information* must have a basis for assessing a tax. The board, however, assesses taxes; information does not assess taxes. We assume the Court of Appeal meant to state that *the board* must have a conceivable basis for assessing a tax.

contended article XIII, section 32 of the California Constitution prohibits judicial relief before payment of taxes. Article XIII, section 32, states: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."[4] ▇ We determined that article XIII, section 32, applies to board demands for information because they are the first step in the assessment and collection of taxes. ▇ ▇ We made clear, however, that "The ban on prepayment judicial review found in the state Constitution must yield, of course, to the requirements of the federal Constitution (*Dupuy* v. *Superior Court* (1975) 15 Cal.3d 410, 418 . . . , and the superior court has jurisdiction to determine whether the Board's inquiry offends the prohibition against unreasonable searches and seizures or violates the right of privacy or the privilege against self-incrimination. [Citation omitted.] [¶] . . . The Board may compel the disclosure of information if: (1) its inquiry is authorized; (2) the requests are specific; and (3) *the information sought is reasonably relevant to the inquiry*." (*Western Oil, supra,* 44 Cal.3d at pp. 213-214, italics added.)

▇ Despite our plain language, the board contends it does not matter whether the information requested is reasonably relevant to a legitimate assessment inquiry. The board relies solely on a subsequent sentence in *Western Oil*: "[I]f the Board has *no conceivable basis* in law or fact for assessing a tax on a given piece of property, then it cannot constitutionally demand information from a taxpayer that would be relevant only to such a tax." (44 Cal.3d at p. 214, italics added.) Based on this sentence, the board argues that article XIII, section 32, allows prepayment judicial review of a demand for information *only* when there is "no conceivable basis" for a tax. In other words, according to the board, if there is a conceivable basis for a tax, a court cannot prohibit a demand for information, even if the information is completely irrelevant to the tax.

The board misreads *Western Oil*. In that case, the board sought information concerning the lands and rights of way on which the assessees' pipelines were located. The assessees did not contend the information was irrelevant to the assessment of that property. Rather, they challenged the infor-

[4] The board also relies on a substantially identical statutory provision in Revenue and Taxation Code section 19081, which states: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against this State or against any officer of this State to prevent or enjoin the assessment or collection of any tax under this part . . . ." Our discussion of the constitutional provision applies with equal force to its statutory counterpart. (*Western Oil, supra,* 44 Cal.3d at p. 213, fn. 2.)

mation demand on the ground that the board lacked jurisdiction to assess the lands and rights of way. In other words, the assessees challenged the basis of the tax, not the relevancy of the information. We rejected their challenge but explained that the board cannot demand information that is relevant only to a tax for which there is no conceivable basis. (*Western Oil, supra,* 44 Cal.3d at p. 214.) We did not state that a conceivable basis for the tax is by itself sufficient to preclude prepayment review of a demand for information. The passage relied on by the board and the remainder of our opinion made clear that the information had to be reasonably relevant. The board's interpretation of *Western Oil* is incorrect because it eliminates the requirement of reasonable relevance—a requirement that is historically rooted in the Fourth Amendment guaranties against unreasonable searches and seizures. (44 Cal.3d at pp. 213-214; see *Okla. Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186, 202-209 [90 L.Ed. 614, 625-630, 66 S.Ct. 494, 166 A.L.R. 531].)[5]

We hold that an assessee is entitled to prepayment judicial relief from an assessor's demand for information if the assessee can show that the information is not reasonably relevant to the proposed tax.[6]

2. ■ *The portions of Union Pacific's plan that deal with possible future acquisitions are not reasonably relevant to assessment of its taxable property.*

The board concedes it is entitled to assess only taxable property that is owned or controlled by Union Pacific on the lien date for the tax year in question. (For convenience, we will refer to such property as Union Pacific's existing or current property.)[7] The board contends, however, that possible future acquisitions discussed in Union Pacific's plan may affect the value of

---

[5] On the issue of whether the plan is reasonably relevant (pp. 147-155, *post*), the board relies heavily on *Union Pacific R. Co.* v. *Looney* (1986) 111 Idaho 1000 [729 P.2d 1063], in which the Idaho Supreme Court considered the relevancy of Union Pacific's 1983 plan. The board's argument that it is entitled to documents regardless of whether they are reasonably relevant is also contrary to *Looney.* The Idaho court made clear that the Idaho State Tax Commission was entitled to Union Pacific's plan only if it was reasonably relevant to assessment of the company's property. (729 P.2d at p. 1066.)

[6] The board relies on our recent decision in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247], in which we rejected a prepayment tax challenge. That decision is clearly inapposite to the present case. There was no challenge in *Calfarm* to an information demand, and reasonable relevancy was not an issue.

[7] The limitation of assessments to existing property is found in the state Constitution. Article XIII, section 19, states in part, "The Board shall annually assess . . . property, except franchises, *owned or used* by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity." (Italics added.)

its existing property and that information regarding those possible future acquisitions is thus reasonably relevant to a legitimate assessment inquiry. We disagree. The board's argument has no basis in law or in fact.

The board is constitutionally required to assess Union Pacific's taxable property at its fair market value. (Cal. Const., art. XIII, § 1.)[8] " '[F]air market value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (Rev. & Tax. Code, § 110, subd. (a); see also Cal. Code Regs., tit. 18, § 2.) ■ "It [fair market value] is a measure of desirability translated into money amounts [citation], and might be called the market value of property for use *in its present condition*." (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544], italics added.) The concept of market value is perhaps most clearly stated in the poetic axiom that, "The worth of a thing, is the price it will bring." (1 Bonbright, Valuation of Property (lst ed. 1937) p. 15; see generally Cal. State Bd. of Equalization, General Appraisal Manual, Assessors' Handbook AH 501 (1982 rev.) pp. 6-10.)

■ The board has not demonstrated how Union Pacific's mere hopes and plans for possible future acquisitions of additional property can affect the fair market value of the corporation's existing property. The board values Union Pacific's property using the income approach. (The record indicates that Union Pacific and the board agree this approach is a permissible valuation method for assessing Union Pacific.) Under this approach, an appraiser values an income-producing property by estimating the present worth of a future income stream. "The income approach may be called the capitalization method because capitalizing is the process of converting an income stream into a capital sum, i.e., value." (Cal. State Bd. of Equalization, The Income Approach to Value, Assessors' Handbook AH 501A (1988) p. 1; Ring & Boykin, The Valuation of Real Estate (3d ed. 1986) p. 330.) The assessor capitalizes "the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt." ■ ■■■■ (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546 564.)[9]

---

[8] Article XIII, section 1, states in part: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value."

[9] In assessing railroads and public utilities the board treats all the entity's property as a unit and determines the value of the unit. (Rev. & Tax. Code, § 723.) "[U]nit taxation is properly

The board appears to have confused the concept of future *income* with that of future *property*. Only income from *existing* property is capitalized. The board's own regulations dealing with the income method state: "The amount [of income] to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the valuation date that the taxable property *existing on that date* will yield under prudent management . . . ." (Cal. Code Regs., tit. 18, § 8, subd. (c), italics added.)[10] The reason that only income from existing property can be considered is that possible income from property not yet acquired would have no effect on market value, i.e., the value to prospective purchasers. "[T]he net earnings to be considered or capitalized are those that would be anticipated by a prospective purchaser." (*California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578, 584 [63 Cal.Rptr. 5, 432 P.2d 700]; *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 566.) The board has not explained why a prospective purchaser would pay for possible income from property not yet owned or controlled by Union Pacific. Possible income from Union Pacific's possible future acquisitions therefore cannot properly be included in the capitalized income stream.[11]

characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property *as a going concern.* . . . [W]hat the board assesses is the value of the public utility property as a going concern; it considers the earnings of the property as a whole, and does not consider, less still assess, the value of any single real or personal asset." (*ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859, 864-865 [210 Cal.Rptr. 226, 693 P.2d 811], italics in original.) The reason for this method is that "The properties owned by railroads and public utilities, although composed of separate and identifiable assets such as locomotives, freight cars, railroad tracks, right-of-ways, buildings . . . and so on, are operationally interdependent and the value of one part cannot effectively or accurately be estimated except as a part of the unit value of the enterprise as a whole." (Ring & Boykin, The Valuation of Real Estate, *supra,* p. 419.)

[10] Similarly, the board's regulations define value under the income approach as "[t]he amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt (the income approach)." (Cal. Code Regs., tit. 18, § 3, subd. (e).)

[11] The fact an informed buyer of property or a business will not pay a price based on the seller's mere desire to acquire additional property may readily be illustrated. For example, assume a situation in which a parcel of land with a building is appraised at a certain price, and a prospective purchaser offers to buy the property for that amount. The owner informs the purchaser of the owner's hope of buying in five years another parcel nearby. Would the purchaser increase his offer for the parcel now being sold? We think not, and the board has not demonstrated any general principle to the contrary. Neither has the dissent done so. Its hypothetical example of tracks near Disneyland reflects a misunderstanding of valuation principles. (Dis. opn., *post,* fn. 3 at p. 162.) The proximity of the tracks to Disneyland might, indeed probably would, affect the railroad's unit value because geographic location affects market value. That effect, however, would arise independently of the company's plans or lack of them. The present fact of proximity—not the company's future plans related to acquiring additional property, which plans may never be fulfilled—is what would affect value.

The dissent's reliance on stock market valuation is also misplaced in two respects. (Dis. opn., *post,* at pp. 161-162.) First, the dissent states without support that unit value is the same

Prior statements by the board contradict its present argument that possible future acquisitions are relevant. In its statement of findings and decision as to the value of Union Pacific's property in 1983, the board explained: *"What may or may not happen* to petitioner's enterprise at some future date *is irrelevant* to the valuation of property that exists on a date fixed by law. . . . [T]his and only this is what a potential buyer would obtain by a purchase of the assets at that particular time. . . . [*N*]*ewly added properties* and other later maintenance investments that would permit continuation of the railroad enterprise *have absolutely nothing to do with the value* as of the March 1, 1983, lien date assessment." (Italics added.) The chief of the board's valuation division testified, "[W]e must estimate the future revenue that will be generated *by the existing plant.* The income approach measures the present value of the future income that will be generated *by the existing plant."* (Italics added.) The board now attempts to distinguish its earlier position by arguing that it was taken in a different context. The board, however, fails to explain why its earlier disavowal of taxing future property should not equally apply to the present situation. Moreover, as a general matter, we see no reason why the board should be allowed to take inconsistent positions merely to obtain results favorable to the board.

The board has not cited a single California case in which a court has held that possible income from possible future acquisitions can be used in valuing an assessee's existing property. *Roberts* v. *Gulf Oil Corp.* (1983) 147 Cal.App.3d 770 [195 Cal.Rptr. 393], cited by the board, does not support its position. In *Roberts,* the relevant issue was whether a county assessor was entitled to the assessee's interpretative data "concerning certain properties *owned* by Gulf [the assessee]." (*Id.,* at p. 775, italics added.) Unlike the present case, the assessor did not seek information regarding property not already owned by the assessee. *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, is distinguishable for the same reason. The board relies on *De Luz* for the principle that, under the income valuation method (used to assess Union Pacific), fair market value is determined based on anticipated future earnings. As we have already explained, future earnings are not the same as future acquisitions. (See discussion at p. 149, *ante.*) *De*

as the aggregate value of a corporation's stock. If that were the case, the board would need do nothing more than determine the price per share paid for Union Pacific's stock on the lien date each year and multiply that price by the number of issued and outstanding shares. Even the board does not advocate such a simplistic approach.

Second, the stock market analogy necessarily assumes public knowledge of Union Pacific's plans because prospective stock purchasers would have to know the plans to be affected by them. It is undisputed, however, that Union Pacific's strategic plan is confidential. It cannot have affected the value of the company's stock. Thus, even if stock market price were a proper measure of taxable value, which it is not, the plan would not be relevant.

*Luz* makes clear that future earnings from existing property are relevant. The opinion does not even suggest, however, that possible income from property not yet acquired is relevant.

The board relies heavily on *Union Pacific R. Co.* v. *Looney, supra,* 111 Idaho 1000 [729 P.2d 1063], in which the Idaho Supreme Court considered whether Union Pacific was required to provide that state's taxing authority with a copy of the same strategic plan sought by the board in this case. The board's reliance is misplaced. First and most important, the *Looney* court's opinion is unclear as to whether the court ordered production of Union Pacific's plan. The trial court had prohibited the Idaho State Tax Commission from requiring production of the plan. On appeal, the tax commission argued that it had requested the trial court to conduct in camera review of the plan before deciding whether it had to be produced. The Idaho Supreme Court noted that the plan "could be relevant" but never squarely held that it was. (729 P.2d at p. 1066.) Rather, the supreme court remanded the action to the trial court to determine whether the commission had in fact requested in camera review. The supreme court held that, if the trial court found the commission had not requested in camera review, the trial court's decision denying discovery of the plan was affirmed. Conversely, if the trial court found the commission had requested in camera review, the failure to conduct review was appealable. Although the supreme court stated no clear holding as to the production of the plan, it seems reasonably clear the court would not have hinged its decision on whether there should be in camera review if the court intended to order production of the plan in any event. It appears that the most the court intended to do was to allow the commission the opportunity to demonstrate the plan's relevance after in camera review. (Union Pacific and the commission settled their dispute, and the plan was never produced.) Moreover, Union Pacific admittedly had refused to produce any portion of the plan. By contrast, in this matter Union Pacific contends it has produced the entire plan except for portions dealing with possible future acquisitions. The *Looney* court's explanation of why the plan might be relevant indicates the court was primarily concerned with information as to existing assets rather than possible future acquisitions. *Looney* does not support the board's position.[12]

---

[12]The dissent states that Union Pacific conceded in *Looney* that its plan "could be relevant." (Dis. opn., *post,* fn. 5 at p. 163.) This observation ignores the fact that in *Looney* Union Pacific had withheld the entire plan. The concession of possible relevance may have applied only to portions of the plan that have already been disclosed in the present case but which had not been disclosed in *Looney.* Union Pacific did not in *Looney* and does not in the present case concede the relevancy of the undisclosed portions of the plan that deal with possible future acquisitions.

Aside from its lack of any supporting authority, the board's argument, if accepted, would result in several practical problems: (1) Assume that in 1982 grain exports were high and hopper cars were in short supply and Union Pacific anticipated in its strategic plan for that year that the company might need to purchase 500 new hopper cars in 1985. Under the theory advanced by the board, it would assess Union Pacific in 1982 based on the projection that in 1985 the additional cars would generate additional revenue. By 1985, however, grain shipments have decreased, and Union Pacific has not purchased any additional cars. The board would already have assessed the company in 1982 based on property that it did not own and never acquired (the additional cars). (2) Several railroads might be contemplating acquisition of the same asset. Under the board's theory, the assessment of each of the competing railroads should include the value of the not yet acquired asset, even though when it is acquired (if ever), the value of only one railroad would be affected. (3) An assessment that includes the value of a possible future acquisition is based on the speculation that the property's current owner is willing to sell it. Indeed, Union Pacific might wish to purchase property that its present owner has no intention of selling. Under the board's view, this property would be included in Union Pacific's assessment. (4) If the board were permitted to assess a prospective buyer for the value of property not yet owned, logic and fairness would require that the board decrease the assessment imposed on the prospective seller. Similarly, the board would have to decrease Union Pacific's assessment by the value of property that the company is considering whether to sell. These practical problems further demonstrate why the only relevant income is that from an assessee's existing property.

Contrary to the board's earlier statements that it assesses only existing property, the board now asserts four grounds of relevance for the requested information as to future acquisitions. None has merit.

a. The board argues that the acquisition of additional assets can affect the value of existing assets. This simple proposition is entirely correct. It is also a red herring. The acquisitions affect the value of existing property when they take place, not while they are merely contemplated. The board's own example demonstrates this principle. The board contends the investment by Chicago and Northeastern Railroad in a coal line greatly increased the railroad's projected annual revenues. The key point, however, is that the railroad's acquisition of additional property had in fact occurred. The acquisition was not merely a plan.

b. The board contends the undisclosed portions of the plan regarding possible future acquisitions are necessary to resolve a dispute between the

board and Union Pacific regarding the tax treatment of annual capital expenditures for replacement of track and rolling stock, more specifically, whether these expenditures should be "expensed" from historic revenue. The board has not explained how the undisclosed portions of the plan would be relevant to this dispute. The possible future repair or replacement of existing assets is easily distinguishable from the possible future acquisition of additional assets. Furthermore, even if information as to Union Pacific's future purchases of replacement track and rolling stock is relevant to the assessment of Union Pacific's existing property, the relevance of that limited information does not mean that all other information as to future acquisitions, e.g., a possible purchase of another railroad, is also relevant. That a particular future acquisition may be relevant does not mean that all possible future acquisitions are relevant.[13]

Moreover, Union Pacific has represented that the plan does not contain information as to replacement of track and rolling stock. Union Pacific's assistant vice-president for finance testified that "Nothing in the Union Pacific Strategic Plan discusses or analyzes the cost of maintaining the average age and condition of the group of assets owned by Union Pacific on the lien date." The board's response to this representation is that the trial court has not examined the undisclosed portions of the plan to verify the truthfulness of Union Pacific's representation. We interpret the board's argument to be an implied request for in camera inspection. If so, the request is untimely. The board concedes that it failed to request the trial court to conduct in camera inspection.[14]

---

[13] The dissent mischaracterizes our discussion of the replacement of track and rolling stock as a determination that ". . . the board was not entitled to discover relevant portions of the strategic plan because some parts of the plan might be irrelevant . . . ." (Dis. opn., *post*, at pp. 163-164.) This is the inverse of our observation. What we make clear is that the board cannot demand Union Pacific's entire plan, including irrelevant portions, on the ground that some portion may be relevant, e.g., the portion dealing with replacement track and rolling stock. As we explain in the next paragraph above, the reason the board is not entitled to the arguably relevant information as to replacement track and rolling stock is that Union Pacific has represented the plan contains no such information, and the board failed to request in camera inspection to refute that representation.

[14] The dissent contends we should pay no heed to the board's failure to request an inspection. (Dis. opn., *post*, at p. 164.) This contention is somewhat curious in light of the dissent's considerable reliance on *Union Pacific R. Co.* v. *Looney, supra,* 729 P.2d 1063. The dissent acknowledges that in *Looney* the court held the Idaho State Tax Commission was not entitled to Union Pacific's plan if the commission failed to request in camera inspection of the plan by the trial court. (Dis. opn., *post*, fn. 5 at p. 163.) Our decision is wholly consistent with *Looney* in this regard. Moreover, the Court of Appeal cases cited by the dissent are inapposite. In three of them the party seeking discovery had prevailed at the trial court and therefore had no need to request in camera inspection. (*Saddleback Community Hospital* v. *Superior Court* (1984) 158 Cal.App.3d 206, 208 [204 Cal.Rptr. 598]; *Fellows* v. *Superior Court* (1980) 108 Cal.App.3d 55, 61 [166 Cal.Rptr. 274]; *County of Kern* v. *Superior Court* (1978) 82 Cal.App.3d 396, 399 [147 Cal.Rptr. 248].) The opposite occurred in this case; the board (the

c. The board's third asserted ground of relevance is that the undisclosed portions of the plan are an essential component of a "multiplier" computation the board uses as a "check and back-up" for the capitalized income approach. Apparently, the multiplier is used as a capitalization rate. We find several problems in the board's reliance on the multiplier. According to the board's own characterization, "The multiplier consists of the actual selling price *of comparable properties* over a limited period of time plus the total of anticipated capital investments in the railroad property divided by the future projected net earnings of the business." (Italics added.) Similarly, the board's regulations state, "Income may be capitalized by the use of gross income, gross rent, or gross production multipliers derived *by comparing sales prices of closely comparable properties* (adjusted, if necessary, to cash equivalents) with their gross incomes, gross rents, or gross production." (Cal. Code Regs., tit. 18, § 8, subd. (h), italics added.) It seems clear enough from these statements that the multiplier approach depends on the sale of properties closely comparable to those of Union Pacific. The board, however, uses the income approach in valuing Union Pacific's property rather than the market comparison approach for the very reason that there are no comparable properties. Indeed, one of the board's staff members testified that he could not use a multiple under the regulation because of the lack of comparable properties. The multiplier approach itself appears to be improper on the facts of this case.

The board also asserts without explanation that, "Without data on *anticipated* investments, the multiplier could not be properly applied." (Italics added.) This argument seems to assume the result sought by the board. The board fails to explain how possible income from possible future investments can be relevant to Union Pacific's existing property. The argument also appears to contradict the board's simultaneous assertion that it is not seek-

party seeking discovery) did not prevail in the trial court and thus did have the incentive to request an inspection but failed to do so. These cases are distinguishable on other grounds as well. In *Fellows* the trial court's decision was not based on the contents of the requested documents, and there was no need for either party to request an inspection. In *Saddleback* and *Kern* the documents were subject to a statute (Evid. Code, § 1157) that restricted their discoverability and which implicated the interests of nonparties. It was arguable that compliance with the statute required in camera inspection regardless of whether it was requested by a party. The dissent's reliance on *Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594 [162 Cal.Rptr. 724], is also misplaced. In that case, the trial court had in fact conducted an in camera hearing, and the parties seeking discovery had requested an additional confidential inspection by an expert. Thus, there was no question in the appellate court of whether the parties seeking discovery had waived whatever right they might have had to an in camera inspection by failing to request one.

Because the board did not request an inspection, we need not and do not decide under what circumstances, if any, either the board or an assessee would be entitled to a prepayment in camera inspection.

ing to tax property not yet acquired. If the multiplier approach includes income from property not yet acquired in either the computation of the multiplier or the earnings to which it is applied, the approach would result in the valuation of property that is not taxable. The approach is flawed in this respect as well.

Perhaps most important, the board admits that use of the multiplier approach is not sanctioned in the California Code of Regulations. Thus, the board appears to engage in bootstrapping by relying on a valuation approach not recognized in the board's own regulations and then arguing that the requested information is relevant to that approach.

d. The board contends the undisclosed portions of the plan are made relevant by the 1982 merger of Union Pacific, Missouri Pacific, and Western Pacific into one railroad system. According to the board, historical data as to the three railroads' separate operations is of little use in valuing the single operating system that resulted from the merger, and the board must rely on income projections in the plan. This argument misses the point. Of course, the board is entitled to information as to anticipated future income from *existing* postmerger property. Such information is not the same, however, as information as to projected income from possible *future* acquisitions.

We have carefully considered each of the grounds on which the board claims relevance of the information as to possible future acquisitions by Union Pacific. We are unpersuaded. We hold that the undisclosed portions of Union Pacific's plan that deal with possible future acquisitions are not reasonably relevant to a legitimate assessment inquiry.[15]

3. *The trial court had jurisdiction to prohibit the board from enforcing its penalty assessment against Union Pacific.*

The board contends Union Pacific should have been required to pay the full penalty, exhaust its administrative remedies before the board, and, if unsuccessful, file an action for a refund. We reject the board's contention that article XIII, section 32 deprived the trial court of jurisdiction to issue its order prohibiting the board from taking any act to enforce or impose any penalty against Union Pacific. As we made clear in *Western Oil, supra,* 44 Cal.3d at page 214, and as we have reaffirmed in this case, an assessee is entitled to prepayment judicial relief from an assessor's request for informa-

---

[15] Union Pacific contends the contested portions of the plan are highly confidential and that it is likely the board would disclose them to third parties, including Union Pacific's competitors, thus causing great prejudice to Union Pacific. In light of our holding that the undisclosed portions of the plan are not reasonably relevant, we need not address this issue.

tion that is not reasonably relevant to a legitimate inquiry. (See p. 147, *ante*.) This constitutionally mandated protection for the assessee would be of little practical benefit if a penalty assessment imposed for a refusal to produce the information could not also be challenged before payment. If that were the rule, an assessee could prevail on his prepayment challenge to the request for information but be required to pay a penalty assessment and then seek a refund. That rule would make no sense. The assessee would be penalized for not producing information that a court had already decided is not reasonably relevant and need not be produced.

The board seeks that incongruous result in this case. Under the board's view, Union Pacific, having obtained a court ruling that it need not disclose the requested information, nevertheless should have been required to pay the full penalty and then commence an action for a refund. That is not the rule. In light of the trial court's decision that Union Pacific properly refused to disclose the information, the court in a subsequent refund action would have had to order a refund of the penalty. The board fails to identify what purpose delaying relief would serve in such circumstances. The law does not require idle acts.

We hold that, if an assessee prevails on its prepayment judicial challenge to an assessor's request for information, the assessee is also entitled to prepayment judicial relief from a penalty assessment imposed for the assessee's refusal to produce the information.[16] The procedures for assessments and challenges to them give rise to a corollary to this rule. While a prepayment challenge to an information demand is pending in a judicial proceeding, the court will not yet have decided whether the assessee is correct. As a practical matter, the assessee will thus be unable to obtain prepayment relief from a penalty assessment by showing that he has already prevailed on his challenge to the information demand. We therefore further hold that, in order to be able to provide meaningful relief to the assessee, a court is allowed to abate temporarily a penalty assessment until the court decides whether the underlying information demand is proper.

---

[16] Because we decide Union Pacific's appeal on this narrow ground, we need not and do not decide the broader question of whether a penalty assessment for a failure to provide information is a tax within the meaning of article XIII, section 32. Courts have occasionally stated that a penalty is part of a tax, but none of the cases containing such statements involved the issue of whether a prepayment challenge was proper under article XIII, section 32. (See, e.g., *County of Los Angeles* v. *Morrison* (1940) 15 Cal.2d 368, 373 [101 P.2d 470, 129 A.L.R. 443] [issue was whether a penalty should be imposed personally against the executor of an estate rather than the estate itself]; *Long Beach City School Dist.* v. *Payne* (1933) 219 Cal. 598, 601 [28 P.2d 663] [dispute between public entities as to which of them should receive penalties for delinquent taxes]; *State of California* v. *Hisey* (9th Cir. 1936) 84 F.2d 802, 805 [issue was whether penalty was a lien on property held by a receiver].)

█ In this case, Union Pacific has prevailed in its challenge to the board's demand for information. Thus, the penalty assessment must be set aside. The question remains as to remedy. The Court of Appeal held that Union Pacific is entitled to a refund of the amount paid pursuant to the penalty assessment. That result, however, would provide Union Pacific with a double recovery of the amount paid. Pursuant to the trial court's April 2, 1985, order, Union Pacific reduced the amount of its second installment for 1984-1985 taxes by the amount of the penalty paid with the first installment (approximately one-half of the penalty). █ As a practical matter, Union Pacific has already received its refund, and the Court of Appeal needed only to have affirmed the trial court's April 2, 1985, order allowing Union Pacific to withhold the amount of the previously paid penalty from its second installment for 1984-1985 taxes.[17]

4. *The trial court's award of attorney fees to Union Pacific was proper.*

After the trial court issued its writ ordering the board not to require Union Pacific to produce the plan, the board nevertheless denied Union Pacific's petition to abate the penalty assessment. The trial court found the board's conduct constituted a violation of Code of Civil Procedure section 128.5 and awarded Union Pacific attorney fees in the amount of $9,950.50 as compensation for obtaining the April 2, 1985, order in aid of enforcement of the writ.[18]

Because we hold the writ of prohibition was properly issued by the trial court, the relevant question is whether the board acted in bad faith in denying Union Pacific's abatement petition despite having knowledge of the writ.[19] The board does not contend it acted in good faith. █ Rather,

[17] The board contends almost in passing that the Court of Appeal decision requiring a refund was also improper because none of the counties who received payment of the taxes pursuant to the board's assessment are parties to this action. The board reasons that a nonparty cannot be compelled to make a refund. In light of our decision that a refund is unnecessary, this argument is moot. It is also incorrect. There is no indication in the record that the board did not fully represent the counties' interest in this proceeding, and none of them sought to intervene. Similarly, the board does not cite any authority that requires a state assessee seeking a refund to name individual counties as parties, and Revenue and Taxation Code section 830, subdivision (d), the provision dealing with refunds of board-imposed penalty assessments, does not even mention counties.

[18] Code of Civil Procedure section 128.5, subdivision (a), states in pertinent part: "Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay."

[19] In light our our holding that the writ was proper, we need not and do not decide the question of whether a party can be sanctioned under Code of Civil Procedure section 128.5

the board relies on the technical argument that it was not required to comply with the writ because it was mandatory in nature to the extent that it required the board to abate the penalty and thus was automatically stayed by the board's notice of appeal. The board relies on the general principle that ". . . an injunction mandatory in character is automatically stayed by appeal." (*Byington* v. *Superior Court* (1939) 14 Cal.2d 68, 70 [92 P.2d 896].) The same principle applies to a mandatory writ. (*Hayworth* v. *City of Oakland* (1982) 129 Cal.App.3d 723, 727-728 [181 Cal.Rptr. 214].) We conclude, however, that the writ in this case was prohibitory, not mandatory.

The board reasons that the penalty had already been imposed before the writ proceeding began, and when the writ was issued, what remained pending was the board's decision on Union Pacific's petition to abate the penalty. The board argues that, if the writ was intended to preclude payment of the penalty, the writ was mandatory because the only way the penalty could be abated was for the board to vote in favor of Union Pacific's petition. In other words, the writ implicitly mandated the board to vote for abatement. Union Pacific argues that the effect of the writ was prohibitive—that it prohibited the board from voting against the petition to abate.

■ Whether the writ was mandatory does not depend on semantic characterizations. The proper question is whether the writ was designed to preserve the status quo between the parties. (*Byington* v. *Superior Court, supra,* 14 Cal.2d 68, 71 [construing injunction]; *Hayworth* v. *City of Oakland, supra,* 129 Cal.App.3d 723, 727-728 [construing writ].) ■ When the writ was issued, the penalty had been assessed, but Union Pacific had not paid the penalty because the petition to abate was pending before the board. Stated simply, no money had yet changed hands. The board's denial of the petition constituted a change of the status quo because Union Pacific was then required to pay the penalty to avoid a tax delinquency. Its only recourse, according to the board, was to file an action for a refund. These circumstances constituted a change in the status quo. The clear purpose of the writ was to prevent a change in the status quo. The writ was prohibitory and was thus not stayed by the board's appeal.

■ The trial court found the board's denial of the petition to abate the penalty was contrary to the intent of the writ. That finding was not an abuse of discretion on the facts of this case, and the award of attorney fees was proper.

---

for violating a court order that is subsequently found to have been in excess of the court's jurisdiction or otherwise improper. (Compare *In re Berry* (1968) 68 Cal.2d 137, 147 [65 Cal.Rptr. 273, 436 P.2d 273] [trial court may not use its criminal contempt power to punish a person for refusing to obey an order issued in excess of the court's jurisdiction].)

DISPOSITION

We reverse the judgment of the Court of Appeal to the extent that it reversed the trial court's orders granting the writ of prohibition (case No. A030006) and awarding sanctions to Union Pacific (case No. A032316). We affirm the Court of Appeal's judgment affirming the trial court's April 2, 1985, order prohibiting the imposition of a penalty assessment and allowing Union Pacific to withhold from the second installment of its 1984-1985 tax payment the amount of the penalty tax previously paid (case No. A031647). No further refund, however, is required. Union Pacific is awarded its costs on appeal.

Lucas, C. J., Panelli, J., Kaufman, J., and Kennard, J., concurred.

**MOSK, J.**—I dissent. The majority render section 32 of article XIII of the California Constitution (hereafter section 32) a nullity by requiring that the board must establish that the strategic plan must *in fact* be relevant to the board's consideration of Union Pacific's tax return rather than that it *might* be relevant. This is a critical distinction because the entire thrust of section 32 is to ensure that the collection of taxes continues unabated *while* a taxpayer and the government litigate a dispute about the assessment and collection of taxes. (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463]; *Modern Barber Col.* v. *Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 726 [192 P.2d 916].)

If the board is required to prove the actual relevance of the information it seeks before Union Pacific is required to pay the tax or the penalty, section 32 serves no purpose. (Cf. *Enochs* v. *Williams Packing Co.* (1961) 370 U.S. 1, 8 [8 L.Ed.2d 292, 297, 82 S.Ct. 1125].) As discussed below, we are required to give effect to section 32 to the maximum extent consistent with the Fourth Amendment of the United States Constitution, and that provision does not require this court to test the board's entitlement to the information it seeks by the stringent standard applied by the majority. A correct analysis of the relevance issue leads to the conclusion that the trial court did not have jurisdiction to prohibit the board from obtaining the information sought by the board's subpoena.

Moreover, in the course of their opinion the majority virtually abrogate the board's right to obtain information from a taxpayer (Rev. & Tax. Code, § 826 et seq.) by holding that the taxpayer is not required to disclose *any* of the information sought if *some* of it is not relevant.

I outline initially what I view as the appropriate principles which the majority should have applied to the board's request for information from Union Pacific. As noted above, the purpose of the provision of section 32 depriving a court of jurisdiction to suspend the collection of taxes is to ensure that collection continues unabated while a taxpayer and the government litigate a dispute regarding their imposition. The validity of the tax is thereafter determined in a suit by the taxpayer for refund. Because any delay in collection may cause serious detriment to the public, courts have been "extremely reluctant" to interfere in the taxation process before the taxpayer pays the levies assessed. (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d 277, 282.) We held in *Western Oil & Gas Assn.* v. *State Bd. of Equalization* (1987) 44 Cal.3d 208 [242 Cal.Rptr. 334, 745 P.2d 1360] (hereafter *Western Oil*) that since a request for information by the board is a first step in the assessment and collection of taxes, section 32 broadly limits the power of a court to prevent the taxing authority from obtaining the information it seeks prior to the time the tax is collected. The ultimate validity of the assessment is not the issue; a court may only examine the board's authority to undertake the inquiry. (44 Cal.3d 208, 214.) Exceptions to the command of section 32 must be narrowly construed in order to carry out the purpose of the section.

We further made clear in *Western Oil* that section 32 must be given effect to its maximum extent, limited only by the provisions of the United States Constitution, and that the appropriate standard for judicial intervention is the one invoked under a federal statute which contains provisions similar to section 32. (44 Cal.3d at pp. 212-213.)[1]

The federal statute is interpreted liberally in favor of the government. (*Enochs* v. *Williams Packing Co., supra,* 370 U.S. 1, 7-8 [8 L.Ed.2d 292, 296-297].) The power of the government to obtain information from a taxpayer has frequently been compared to the powers of investigation of a grand jury; issues of materiality and relevancy are essentially the same as those applied to grand jury investigations. (See, e.g., *United States* v. *Ryan* (9th Cir. 1971) 455 F.2d 728, 733 [20 A.L.R.Fed. 719]; *Foster* v. *United States* (2d Cir. 1959) 265 F.2d 183, 186-187.) Because the burden on the government would be too great if it were required to prove the relevance of material which it does not have by the standards applied to the admissibility of evidence at trial, it need not prove that the information is actually relevant in any technical, evidentiary sense. (*La Mura* v. *United States* (11th Cir. 1985) 765 F.2d 974, 981.)

---

[1] The federal statute provides in pertinent part, "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ." (26 U.S.C. § 7421(a).)

In applying the "reasonable relevance" test called for by the Fourth Amendment the federal cases uniformly hold that to justify a request for information, the government is required to show only that the material sought has potential relevance to an investigation. It meets this burden by showing that the information *"might throw light upon the correctness of the taxpayer's return"* or *"illuminate any aspect of the return."* (See, e.g., *United States* v. *Arthur Young & Co.* (1984) 465 U.S. 805, 813-815 [79 L.Ed.2d 826, 833-835, 104 S.Ct. 1495]; *Matter of Newton* (11th Cir. 1983) 718 F.2d 1015, 1019; *United States* v. *Southwestern Bank & Trust Co.* (10th Cir. 1982) 693 F.2d 994, 996; *United States* v. *City Nat. Bank & Trust Co.* (10th Cir. 1981) 642 F.2d 388, 389; *United States* v. *Goldman* (9th Cir. 1980) 637 F.2d 664, 667; *United States* v. *Wyatt* (5th Cir. 1981) 637 F.2d 293, 300; *United States* v. *Freedom Church* (1st Cir. 1979) 613 F.2d 316, 321; *United States* v. *Davey* (2d Cir. 1976) 543 F.2d 996, 1000; *United States* v. *Ryan, supra,* 455 F.2d 728, 733; *United States* v. *Leaseway Transp. Corp.* (N.D.Ohio 1981) 523 F.Supp. 1333, 1338; *United States* v. *Campbell* (D.S.D. 1975) 390 F.Supp. 711, 713.)[2] The government must have a "realistic expectation rather than an idle hope that something might be discovered." (*United States* v. *Wyatt, supra,* 637 F.2d 293, 300-301.) This is the standard which the majority should apply, but fail to do so without explanation or even recognition of the existence of the rule.

Instead of exercising "extreme reluctance" to interfere in this prepayment challenge, the majority resolve every doubtful point against the board's position, make unwarranted and unsupported assumptions to justify Union Pacific's resistance to the subpoena, and even resolve conflicting claims as to the proper valuation method applicable to the assessment of Union Pacific's property against the board's position.

The fundamental premise on which the majority hold that the strategic plan is not relevant is that the market value of Union Pacific's property cannot be affected by the railroad's plans to acquire property in the future (maj. opn., *ante,* at p. 148) and that an acquisition can only affect existing value when it takes place (maj. opn., *ante,* at p. 152). These conclusions are not based on any evidence in the record but simply on the unsupported assumptions of the majority. The fact present value can be affected by a planned acquisition is demonstrated by the analogous situation of the stock market. Every day, stocks rise and fall in the stock market on the basis of

---

[2] The seminal case on the question of the Internal Revenue Service's (IRS) right to obtain information from a taxpayer under the Fourth Amendment is *United States* v. *Powell* (1964) 379 U.S. 48, 57-58 [13 L.Ed.2d 112, 119-120, 85 S.Ct. 248]. It holds that the IRS needs to show only that the information it seeks *may* be relevant to a legitimate purpose. The federal courts have consistently construed this language as imposing the "might throw light" test.

reports that one corporation may acquire the assets of another. Obviously, the likelihood that information relating to the acquisition of future assets will affect the current value of a corporation depends on the probability that the acquisition will occur, the imminence of the acquisition, the value which the property to be acquired will add to the purchaser, and other such factors. Of course, a buyer of shares might not know definitely that the acquisition will occur, but even a rumor of the acquisition may induce him to pay a higher price for the corporation's stock. On the other hand, the potential buyer of a railroad would doubtless be informed of the planned acquisition if the purchase would enhance the value of the railroad and thus the purchase price. In any event, it seems to me unarguable that future acquisitions *might* affect the present value of Union Pacific's property.[3] This is all that is required by the Fourth Amendment to justify the board's request for disclosure of Union Pacific's plan.

Contrary to the majority opinion, the decision of the Idaho Supreme Court in *Union Pacific R. Co.* v. *Looney* (1986) 111 Idaho 1000 [729 P.2d 1063] provides persuasive authority that the strategic plan might throw light on the evaluation of Union Pacific's tax return. The majority fail to point out that Union Pacific conceded before the Idaho court that information as to its corporate plan—substantially the same information the board seeks here—"could be relevant to contradict or impeach other evidence of valuation." (729 P.2d at p. 1066.)[4] Furthermore, the majority state that the

---

[3] Union Pacific's value for tax purposes is measured by the value of all its property viewed as a unit. (Maj. opn., *ante*, at pp. 148-149, fn. 9.) This is the same measurement used to determine the value of a corporation's stock. But even if the analogy is not wholly sound, how can it be said that Union Pacific's present value *cannot* be affected by a planned acquisition?

A simple hypothetical: Suppose Union Pacific's tracks for passenger trains go within one mile of Disneyland, and the company has plans to acquire within the next few months—either by purchase or condemnation—a right of way for the intervening mile so as to carry passengers to Disneyland. *Might* not a buyer, informed of this plan, assess the likelihood that the purchase will be made or the property will be taken by eminent domain, and be willing to pay a higher price for the company's assets on the basis that its value is greater than indicated by the property it presently owns? I do not see how the majority can say that the company's plan to acquire the facility could not affect its value (maj. opn., *ante*, at p. 149, fn. 11), particularly if the acquisition was reasonably certain and imminent.

[4] This concession is plain on the face of the *Looney* opinion. The majority's surmise that the concession *might* have applied only to parts of the plan (maj. opn., *ante*, at p. 151, fn. 12) is wholly an invention of the majority. There is not the slightest hint on the face of the *Looney* opinion to support this contorted analysis of Union Pacific's concession that the plan "would be relevant."

I note also that the majority disapprove of assertedly inconsistent positions taken by the board regarding the relevance of future acquisitions. (Maj. opn., *ante*, at p. 150.) This disapproval apparently extends only to the government and not to a taxpayer. Not only did Union Pacific concede in *Looney* that the information regarding its future acquisitions could be relevant to the government, but, as we shall see, in the present litigation it insisted that the board

Idaho Supreme Court noted only that the plan "could be relevant" but "never squarely held that it was." (Maj. opn., *ante,* at p. 151.) Under a correct application of the relevancy standard, a determination that the plan "could be relevant" is sufficient to justify the demand for disclosure. In any event, the court concluded that if the plan *could* be relevant it "would be relevant to valuation" (*ibid.*), and therefore disclosure would be required.[5]

Another example of the majority's failure to consider the board's assertion of relevancy by the appropriate standard is its rejection of the board's "multiplier approach." They hold that the board was not entitled to discovery of the strategic plan because it claimed that the plan was necessary in order for it to apply the "multiplier" method of computation. That method was not appropriate here, hold the majority, because its use depends on evidence of comparative sales, and a member of the board's staff testified that there were no properties available for comparison. (Maj. opn., *ante,* at pp. 154-155.) This statement was made during hearings held by the board to determine the appropriate method of valuation, and there was sharp disagreement in the testimony of witnesses for Union Pacific and the board's staff on that issue. Indeed, it was Union Pacific's own expert who claimed that the board should have and did not use the "multiplier" method. It is inappropriate to decide at this stage that the board was not entitled to adopt a particular method of valuation and that, therefore, it must be denied the information which it seeks in order to apply the valuation method it deems appropriate. This is but another example of the majority's failure to be bound by the constraints imposed on this court in considering the validity of a prepayment challenge by a taxpayer to a request for information.

---

adopt the "multiplier" method of computation. Yet Union Pacific claims before this court that this method is inappropriate, and the majority agree.

[5] I also disagree with the majority's determination that the *Looney* decision does not amount to a holding on the issue of relevance of the plan. (Maj. opn., *ante,* at p. 151.) It is true that the Idaho Supreme Court remanded the matter to the trial court for a determination whether the taxing commission had made a request for an in camera inspection of the plan and held that if no such inspection had been requested then the commission was not entitled to discover the plan. But this ruling appears to refer to an additional factual issue in the *Looney* case, i.e., the correctness of the lower court's finding that the damage to Union Pacific from releasing the information would be greater than the tax commission's need for it. The evaluation of this claim obviously requires an in camera inspection of the material sought. On the issue of relevance, the court clearly held that Union Pacific admitted that the plan could be relevant, and that in view of that concession the plan "would be relevant."

Nor do I agree with the majority's statement that *Looney* is distinguishable because the Idaho court was "primarily concerned with information as to existing assets rather than possible future acquisitions." (Maj. opn., *ante,* at p. 151.) The discovery motion considered in *Looney* was directed entirely to any "long-range or strategic plan prepared . . . during the calendar year 1983," and all the evidence discussed in the opinion related to the relevance of future acquisitions to the present value of a railroad.

The majority's determination that the board was not entitled to discover relevant portions of the strategic plan because some parts of the plan might be irrelevant is also, in my view, clearly erroneous. (Maj. opn., *ante,* at pp. 152-153.)[6] If some parts of the plan are irrelevant, the solution is not to deny discovery of the entire plan but to require the court to examine the plan in camera so that it may separate the relevant from the irrelevant parts of the plan. (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 658 [125 Cal.Rptr. 553, 542 P.2d 977] ["The trial court has available certain procedural devices which may be useful in fashioning an appropriate order that will, so far as possible, accommodate considerations of both disclosure and confidentiality. These include . . . the holding of *in camera* hearings. There may well be others which ingenious courts and counsel may develop."].) This is a procedural device often employed by trial courts to protect the confidentiality of information when discoverable and nondiscoverable materials are contained in the same document. (E.g., *In re Lifschutz* (1970) 2 Cal.3d 415, fn. 23 at p. 437 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1] ["[T]he trial judge should take necessary precautions to protect . . . confidentiality . . . for example, he might routinely permit . . . disclosure to be made *ex parte* in his chambers."]; *El Dorado Savings & Loan Assn.* v. *Superior Court* (1987) 190 Cal.App.3d 342, 346 [235 Cal.Rptr. 303] ["[R]espondent court should first examine the file in camera and order disclosure of only that information which might be relevant to the lawsuit"]; *Saddleback Community Hospital* v. *Superior Court* (1984) 158 Cal.App.3d 206, 209 [204 Cal.Rptr. 598] ["To protect both parties . . . there must be an *in camera* hearing by the trial court . . . . [¶] . . . '[W]here an exception to a privilege depends on the content of a communication, the court may require disclosure *in camera* in making its ruling.' "]; *Fellows* v. *Superior Court* (1980) 108 Cal.App.3d 55, 68 [166 Cal.Rptr. 274] ["In order for the trial judge to rule on the claim of . . . privilege . . . it is necessary for the court to make an *in camera* inspection of these documents."]; *Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 605 [162 Cal.Rptr. 724] ["The court should initially examine the records *in camera* to determine if the material therein reveals that petitioners were readily identifiable as victims . . . ."]; *County of Kern* v. *Superior Court* (1978) 82 Cal.App.3d 396, 401-402 [147 Cal.Rptr. 248] ["The . . . file . . . should be

---

[6]This holding appears on pages 152-153 of the majority opinion . The opinion states that "even if information as to Union Pacific's future purchases of replacement track and rolling stock *is relevant* . . . the relevance of that limited information does not mean that all other information as to future acquisitions . . . is also relevant." (Italics added.) The opinion then goes on to deny an in camera inspection. This amounts to a determination that the board was not entitled to discover Union Pacific's plan for future purchases of replacement track and rolling stock, even though relevant, because other types of future acquisitions may be irrelevant.

carefully examined by the trial court in an *in camera* hearing to excise . . . any part derived from the work of a protected committee."].)

The majority's denial of an in camera inspection on the ground that the board did not make such a request is erroneous. In none of the cases cited above did the litigant make such a request. Whatever may be the rule in Idaho, the cases cited above make it clear that no request for an in camera inspection is required in California, and that such an inspection is made on the trial court's own motion in order to enable it to rule properly on a request for discovery. In all these cases, the failure by the trial court to hold an inspection to avoid disclosure of confidential information was held erroneous or the court was simply ordered to make the inspection. Neither these cases nor any others cited or found in this state imply that a request for an in camera hearing is necessary.[7] Clearly, the trial court may be required to conduct an in camera examination on its own motion when it is necessary to grant discovery of part but not all of a document.

I just cannot see how this court can deny the right of the board, a government agency acting in the public interest, to have an in camera determination by the trial court of the relevance or existence of material sought for taxing purposes. If the trial court finds that some of the material is irrelevant, discovery as to that material is denied and the taxpayer is protected. But if some of it is relevant, then discovery should be ordered.

If, as I conclude, the trial court had no jurisdiction to enjoin the board from enforcing the subpoena, it follows that it also lacked jurisdiction to prohibit the board from enforcing the penalty assessment.

The consequence of the majority's holding is to encourage taxpayers to resist board subpoenas. By claiming that some of the material sought is irrelevant the taxpayer may bar the government from further inquiry. If he asserts that the subpoena is invalid because all the documents demanded are irrelevant, he imposes on the board the burden of proving by the standards

---

[7] The majority's attempt to distinguish these cases on the ground that the party seeking discovery had no incentive to request an in camera hearing because he prevailed in the trial court is erroneous. (Maj. opn., *ante,* at pp. 153-154, fn. 14.) In *Mavroudis, supra,* 102 Cal.App.3d 594, the trial court denied discovery, yet the appellate court ordered it to conduct an in camera hearing to separate discoverable from nondiscoverable information, although there is no indication that the losing party had made a request for such a hearing. Nor is it significant that some of the cases cited above involved a privilege granted by statute. Whether the privilege is granted by statute or involves a constitutional right to privacy (as in *El Dorado Savings & Loan Assn.* v. *Superior Court, supra,* 190 Cal.App.3d 342, 346), or merely an overly broad request for discovery, the rule is the same: the trial court must hold an in camera hearing on its own motion if such a hearing is necessary to decide whether a request for discovery should be granted.

applicable to a full-blown trial that the information is in fact relevant to the board's inquiry, even if that may require the board to prove such detailed matters as the justification for its method of valuation. It may and often will take years for a final determination of these complex matters. (In the present case, for example, it has been five years since Union Pacific filed its petition for a writ of mandate.) If the government ultimately prevails, during the period of litigation the taxpayer will have avoided payment of both the taxes which might result if the information had been provided and the penalty which was imposed for failure to provide the information. Since the purpose of section 32 is precisely to place the disputed sums in the hands of the government while the parties litigate the validity of the tax, the majority abrogate that provision by their holding.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied September 28, 1989. Broussard, J., was of the opinion that the petition should be granted.